WALKER, appellant, and HILL's EXECUTORS and others, respondents.

1. The general rule is, that the competency of a witness is determined by his *status* when he is sworn and examined.

2. By the act of March 27th, 1866, (*Nix. Dig.* 1045,) a party in a representative capacity may be admitted as a witness in his own behalf; and if so admitted, the opposite party may in like manner be admitted as a witness. If, in an action in which the executor of a deceased is a defendant, the complainant offers himself as a witness and is examined in his own behalf before the defendant has been sworn in his own behalf, the complainant is not a competent witness when sworn; and his deposition will not be made competent by the fact that the defendant is subsequently examined in his own behalf. But if the defendant intends to exclude the complainant's deposition, he must move to suppress it, accompanied by an offer to withdraw his own deposition. If no motion to suppress is made, and at the hearing the defendant relies on his own deposition, he will be held to have elected to legalize the deposition of the complainant, which would have been legal if taken in a different order, and will be estopped from taking the unfair advantage of reading his own deposition and excluding that of the other party.

3. An agreement by a purchaser at a sheriff's sale to purchase lands for the defendant in execution, and to hold the title obtained under the sheriff's deed for the benefit of such defendant, is an agreement within the statute of frauds; and, if merely by parol, will not be specifically enforced, except on the ground of fraud and oppression on the part of such purchaser, by means of which he has obtained the property of the debtor at an inadequate price, under the assurance of a contract to reconvey to him, or to hold the same subject to future redemption.

4. *Lis pendens* filed without any bill having been filed as a constructive notice, is a nullity.

5. A secret arrangement between a defendant in execution and a third person, for the purchasing in by the latter, of the property of the former at a judicial sale, upon a trust for the benefit of the defendant, the object of which is the present disposition of the debtor's property to avoid its subjection to execution and sale at the instance of other creditors, by means of which the property is bought in at inadequate prices, is contrary to the policy of the statute concerning fraudulent conveyances; and a court of equity will not grant relief upon such an agreement by compelling the purchaser to convey to the defendant in execution.

6. A deed, executed and acknowledged in this state by a sheriff for lands sold by him under execution, may be delivered in another state.

---

The pleadings and facts in this case are stated in the opinion of the Chancellor. Briefly, the case is this: The complainant, who is the appellant, prior to 1862 was the owner of certain lands in the county of Morris, consisting of a homestead farm, containing two hundred and eighty-two acres, and several lots lying adjacent thereto; together with personal property, comprising the furniture and library in the house, and stock of various kinds on the farm. The real estate was mortgaged to different persons for the principal sum of $24,650, and encumbered by judgments against the complainant. Two of these judgments, amounting in the aggregate to the sum of $3700, debt and costs, were in favor of Hill. In 1862 and 1863, the personal property and the complainant's equity of redemption in the lands were sold at sheriff's sale. At these sales, Hill became the purchaser of the lands, subject to the encumbrance of the mortgages thereon, and also of the greater portion of the personal property. Subsequently, the mortgages on the farm were foreclosed, on proceedings brought by one Atwater, who was

the holder of the mortgage which was second in order of priority. At the sale by the sheriff under the foreclosure, Hill became the purchaser of the farm for $19,999. The amount due on the mortgages, for debt, interest, and costs, at the time of the sale, was $37,194.30. The sale under the foreclosure proceedings was made on the 12th day of September, 1864, but the deed was not delivered until the 5th day of September, 1866, and the delivery was made in the city of New York. On the 15th of September, 1866, Hill granted and conveyed to McAlpine the farm, and also all the personal property on it which he had bought at the sheriff's sale (except the library and library furniture), for the sum of $28,000.

The charge in the bill is, that the several purchases by Hill, at the sheriff's sales, were made by him in trust for the benefit of the complainant after the payment of the debt due to Hill, and the encumbrances on the property. The prayer is, that the said trust may be declared, and the complainant be permitted to redeem ; or, if necessary, that the property, real and personal, may be sold, and after payment of all legal and equitable liens, the balance realized may be paid to the complainant.

Separate answers were filed by Hill, George Walker, and McAlpine, and by J. D. Van Buren and Augustus Cutler, who were also made parties to the suit. Soon after the answer of Hill was filed he died, and the suit was revived against his personal representatives.

On hearing before the Chancellor, the bill was dismissed, and the appeal is from the decree of dismissal.

The opinion of the Chancellor is reported in 6 *C. E. Green* 192.

*Mr. Vanatta*, for appellant.

*Mr. A. Mills* and *Mr. C. Parker*, for Hill's executors.

*Mr. T. Little*, for McAlpine.

The opinion of the court was delivered by

DEPUE, J.

The reliance of the complainant for the proof of his case is mainly upon his own testimony. It is insisted that his deposition was not competent to be read in the cause.

Hill died on the 7th of February, 1868. By his will, he constituted John D. Van Buren, Anthony B. Hill, John A. Hill, Joseph Dunderdale, George Walker and John A. Weeks, the executors thereof. The suit was revived against them by an order of revivor, made on the 22d of May, 1868. The examination of witnesses was commenced on the 14th of May, 1868, and the complainant was sworn as a witness in his own behalf on the 26th of June, 1869, under objection from the defendants' counsel.

Before the passage of the act of 1859, concerning witnesses, (*Nix. Dig.* 1044, § 34,) the complainant would have been an incompetent witness, for the reason that he was a party to the suit. By that act the disqualification arising from interest in the event of a cause, as a party or otherwise, was removed, with a proviso that no female should be admitted as a witness for or against her husband, except when the suit is between her and her husband; nor should any party be sworn in any case where the opposite party is prohibited by any legal disability from being sworn as a witness, or either of the parties in the cause sue or are sued in a representative capacity. By the subsequent act of March 27th, 1866, it is made optional with the party who is such in a representative capacity, to offer himself as a witness, and if he does so, he thereby renders his adversary also, a competent witness in the cause. *Nix. Dig.* 1045, § 35; *Shepherd's Executrix* v. *McClain,* 3 *C. E. Green* 128; *Hartman* v. *Alden's Executrix,* 5 *Vroom* 522.

When the complainant was sworn and examined in chief, none of the defendants who are parties to the suit in a representative capacity, had been sworn. He was not a competent witness then, and his incompetency disqualified all the parties on the other side from being sworn as witnesses

in their own behalf, except such of them as were parties in a representative capacity. At a subsequent stage of the examination, Van Buren, George Walker, Anthony B. Hill, and Dunderdale, four of the executors of Anthony J. Hill, were examined as witnesses in their own behalf. The complainant was afterwards recalled, and again examined in his own behalf, strictly by way of rebuttal.

Neither of the depositions of the complainant was made competent by the fact that some of the personal representatives of Hill had, before the taking of the latter, been sworn in their own behalf. A party who swears and examines before the master a witness, who is, at the time of swearing, an incompetent witness, proceeds at his peril. He cannot by such a course be permitted to allure his adversary into a subsequent course of examination, that if precedent to his illegal proceeding would have removed the objection to his witness. Both these depositions would be suppressed if the conduct of the cause before the Chancellor, and at the hearing before this court, had not been such as to conclude the defendants from the objection.

The general rule is, that the competency or incompetency of a witness is determined by his *status* when he is sworn. The objection must then be taken. *Berryman* v. *Graham,* 6 *C. E. Green* 370. And if he is then a competent witness, his deposition may be read at the hearing, though in the altered situation of the parties, he would not be competent if called as a witness at the time his deposition is offered to be read. *Marlatt* v. *Warwick,* 4 *C. E. Green* 439. But the admissibility of parties as witnesses, when persons standing in a representative capacity are parties on the other side, rests upon peculiar grounds. The option is exclusively with the latter to make the former competent witnesses in the cause. That option must be exercised fairly. If, after the depositions have been taken on both sides, an application be made to suppress the deposition of the former, as having been taken at a time when he had not been made a competent witness by the action of the other side, it would be

granted only on condition that the depositions of the personal representatives should also be withdrawn; or, if the condition imposed be refused, an order might be made for the reexamination of the party.    It is the province of the court to so control the conduct of a cause and regulate its practice, that no unfair advantage is taken by either side in presenting the merits of the cause for decision.

To restore the English practice, so long disused in this state, of requiring all objections to the competency of witnesses to be made before the depositions are read at the hearing, would be impolitic.    Neither can it be said that the defendants determined their election to admit the complainant as a witness by calling the executors of a co-defendant as witnesses in their own behalf—a course they were entitled to pursue, as a precaution against surprise in the event of the complainant's deposition being admitted for any purpose. But when the party with whom alone the objection lies—who is himself a competent witness, and, by his own examination as a witness, may remove the disqualification of the other—makes no motion to suppress the deposition of the latter, accompanied by an offer to withdraw his own deposition, but on the contrary reads his own deposition, and relies upon it at the hearing, he will be held by such course to have elected to legalize the deposition taken on the other side, which would have been legal if taken in different order, and will be estopped from taking the unfair advantage of reading his own deposition, and excluding that of the other side.

Under the circumstances of this case, we think that the depositions of the complainant are competent to be considered on the hearing of the cause.

The complainant relies on a parol agreement with Hill to purchase his property at the several sheriff sales in trust for him, to hold for his benefit, upon being reimbursed the moneys lent by Hill to the complainant, or paid for his benefit in satisfaction of encumbrances, and the payment of the two judgments Hill had against him.    By the bill, an

answer under oath is waived. Hill's answer, therefore, is not to be regarded as evidence in his own behalf on final hearing, but we may, nevertheless, look into it to see what issues are presented by the pleadings. He denies that he purchased the property, real or personal, or any part thereof, in trust or in confidence, express or implied, for the benefit of the complainant. With respect to the sale of the real estate under the Atwater foreclosure, he affirms that the sale was made for the purpose of having settlements made and debts paid, and that he bid on the property, and intended his purchase for and in the name of George Walker, the principal creditor of the complainant, who was then absent from the country.

The defendants having denied the existence of any agreement whatever with respect to the purchase of the lands, are entitled to the benefit of the statute of frauds without pleading it as a defence. The effect of a total denial of any contract is to put the complainant to proof of the trust, by legal and competent evidence, which by the statute is required to be in writing. *Van Duyne* v. *Vreeland*, 1 *Beas.* 150; *Whyte* v. *Arthur*, 2 *C. E. Green* 521.

An agreement by a purchaser at a sheriff's sale to purchase lands for the benefit of the defendant in execution, and to hold the title which he obtains under the deed from the sheriff for the use of such defendant, is an agreement within the statute of frauds. Where the elements of the case are simply a purchase under a parol promise to hold for the benefit of the defendant in execution, such a transaction cannot be enforced either at law or in equity. The jurisdiction over transactions of this nature rests on the ground of fraud and oppression on the part of the purchaser, by means of which he has obtained the property of the debtor at an inadequate price, under the assurance of a contract to reconvey the property to him, or to hold the same subject to future redemption. *Merrit* v. *Brown*, 6 *C. E. Green* 401.

It is obvious that the contract which is relied on, must precede the sale. A subsequent agreement to hold lands,

the title to which has already passed to one contracting party by means of a sheriff's deed, in trust for the benefit of another, is manifestly the creation of a trust in lands, and if made by parol, is directly within the prohibition of the statute of frauds. Such a contract is incapable of being sustained or aided by allegations of fraud, upon which ground alone the jurisdiction of equity rests. It is the precedent contract with the defendant in execution for a re-conveyance, and the fraudulent conduct of the purchaser in connection with the sale, which have enabled him to acquire the debtor's property at an unconscionable advantage, that the court seizes hold of as a ground of equitable relief. Fraud cannot be predicated of a mere refusal to perform a contract which has no legal vitality.

The bill of complaint does not charge that any distinct and explicit contract was made between Hill and the complainant, prior to any of the sales. The charge in the bill is, that the clear understanding between the complainant and Hill was, when said Hill purchased the personal property, and also when he purchased the real estate, that he would hold the same merely as security for the complainant's indebtedness to him; and when the complainant should pay such indebtedness, said Hill should have no further interest in any of the said property, but that the same should go to the use and benefit of the complainant and his other creditors, and that such was the intention of the said Hill. With the exception of allegations in general terms, that Hill purchased for the use and benefit of the complainant, and that the understanding was that Hill held for his benefit, the bill does not contain any other matter in relation to a contract between the parties. In the most ordinary case of a bill for specific performance, the bill must distinctly show that some contract was made, and set out distinctly and unequivocally that the parties contracted in definite terms.

In his testimony the complainant is more specific. He testifies that in the spring of 1862, finding it necessary to be absent a great deal on government business, he and Hill had

a talk over matters, and the agreement was entered into that they would not have the executions which were upon the property "dangling along," but that they would have the property sold, and that Hill should bid it in, or cause it to be bid in, at the lowest possible sum, without reference to the executions, and hold it in trust for the complainant till he got ready to pay him, whether it was more or less. This arrangement had reference to the sale of the personal property and of the equity of redemption in the lands, which were then encumbered for very nearly their full value. The personal property was sold on the 2d of May, 1862, and the equity of redemption in the several parcels of land at three several times, the first of which was on the 25th of August, 1862, and the last on the 2d of February, 1863. The decree in the Atwater foreclosure case was not obtained until the 5th of April, 1864. Under this decree the farm, containing two hundred and eighty-two acres, which was subsequently conveyed to McAlpine, was sold. With respect to that transaction, the complainant says that an arrangement was made with Hill that George Walker should purchase the interest of Atwater in the decree, which was accordingly done, and that in May, 1864, he requested the property to be sold under it. The sale took place on the 12th of September, 1864. The complainant was not present at the sale, being then in the West. He testifies that before he went away, Hill said, if the property had to be sold he would bid it in and hold it the same as at the other sale. This is all the direct evidence there is on the subject. It comes from the mouth of the complainant alone. No reliance is placed on the testimony of Vanderbilt and Mrs. Gleason. The Chancellor's estimation of these witnesses is quite equal to their deserts.

The complainant, by waiving an answer under oath, deprived Hill of the benefit of his answer as evidence in the cause. Hill died before the examination of witnesses was commenced in the cause, and we have not heard his statement of the transaction between them. These circumstances

have given the complainant an advantage over his adversaries, that admonishes the court to scrutinize his testimony carefully, and compare it with the other facts in the case, before we yield to it our convictions.

The parties interested in the decree in the Atwater case, were Atwater, to the amount of $8625; Maria Walker, to the amount of $7475; and George Walker in the sum of $16,565. George Walker's claim was last in order of priority, and, by the assignment in the spring of 1864, he became the owner of Atwater's interest in the decree. The whole amount of the claims on the premises under this decree was about $32,700, exclusive of interest and sheriffs' execution fees. Cutler was also the holder of a mortgage upon the farm and six outlying lots, for an unascertained sum, given to indemnify him against endorsements which he should make for the complainant. The sum due on this mortgage at the sale, in 1864, was about $3000. About $1400 still remained due Hill on his judgments. Making allowance for interest and sheriffs' fees, there was due on the several claims above mentioned nearly $40,000, of which upwards of $26,000 was due to George Walker, in his own right, and as assignee of Atwater.

Hill, in these matters, was the agent of George Walker, who was then living at St. Croix. He alleges that he purchased for George Walker to save his interests. His statement is confirmed by the testimony of Dunderdale and George Walker. The letter written by the complainant to Hill, on the 26th of May, 1864, shows a state of feeling between him and Hill that would make it quite unlikely that Hill would voluntarily consent to stand in the position of a trustee for him, or that the complainant, who was himself a lawyer, would place himself in Hill's hands, under a trust, without some distinct agreement as to the nature of the trust, and some means of proving it if Hill was disposed to deceive him. It was natural that Hill should purchase in the property to secure George Walker. It was unreasonable that in doing so he should clog his purchase with

a trust that would most certainly embarrass the interests of his principal. It is possible that Hill's wishes were that the complainant should be indulged to any extent not incompatible with securing, as far as possible, the money which was due George Walker. Unless he was a guilty party to a fraudulent combination to defraud the creditors of the complainant, it is highly improbable that he would enter into any positive contract or agreement with respect to the future disposition of the property, which would be a violation of his duty to George Walker, whom he represented in the business.

Mr. Cutler's testimony, too, must be regarded as opposed to that of the complainant, so far as relates to the existence of any contract of the kind relied upon by the complainant. He was the brother-in-law of both these parties. He was the attorney of Hill in obtaining his judgments, and also the attorney of the complainant in all his legal business before this litigation. He appears to have been the trusted confidential counsel and friend of both these parties, as well as the agent of Hill, after the purchase of 1864, until the employment of Van Buren, in 1866. He was present at all the sales of the complainant's property. He did the bidding for Hill at the sale of the personal property and of the farm. That he was kept in ignorance of any arrangements that were made between Hill and the complainant, in matters in which they were mutually interested in relation to these sales, is incredible. He has put upon record, by his testimony, and by his letter to Mr. Hill, in February, 1867, the most unequivocal denial of any knowledge of any contract or agreement by Hill for the purchase of the property in trust for the complainant. Mr. Cutler was called as a witness by the complainant. An examination of his evidence unresistibly leads to the conclusion, that while it was understood that from the premises all the mortgages on the lands should be paid, no agreement whatever was made with the complainant that any interest on his part should remain in the premises after the sale. His testimony is, that the under-

standing was that Hill was to take title to the property, and hold it for the benefit of the mortgagees; that the property was to be re-sold, and from the proceeds of such sale the mortgagees were to have their pay; that there were repeated interviews between Hill, the complainant and himself before the sale, and that they were all satisfied that the proceeds realized from a judicious sale of the farm would be sufficient to pay off the mortgages. The object the parties had in view would be subserved by a purchase for the benefit of George Walker: the deed being made to Hill to facilitate a re-sale, because of the absence of George Walker from the country. No motive could possibly exist for observing the form of a sheriff's sale, to create what was in effect a new mortgage in Hill, unless it was a device to more effectually cover up a fraud against creditors, which had been perpetrated in the sales of 1862 and 1863.

The object which Cutler understood the parties had in view in the purchase of the farm has, in fact, been accomplished. From the proceeds of the sale of 1866 the amount due Maria Walker, under the Atwater decree, was paid. The residue was received by George Walker, upon his interest in the Atwater decree, and the balance of his claim has been extinguished by a subsequent release. Hill, in his lifetime, became the owner of the Cutler mortgage, by satisfying the amount due to Cutler on it. No claim has been made under that mortgage, by Hill or his representatives, against the complainant. When such claim shall be made, it will be subject to the defence that it was satisfied by the understood purpose of the purchase of 1864.

It is insisted that the testimony of the complainant is confirmed by the proof in relation to his being permitted to have the beneficial use of the property until 1866, and the delay in taking the deed for the farm from the sheriff. The indulgence granted to the complainant is satisfactorily explained. George Walker, after his brother's death, had conveyed the farm to the complainant, as a gratuity, subject only to the mortgage which Maria Walker held. Hill was a brother-in-

law, and, at the time of these transactions, a widower and childless. The case contains abundant evidence of their kindness to, and assistance of the complainant, and of his need for the aid they so generously extended. The delay in accepting the sheriff's deed is accounted for by the absence of George Walker from the country, and the fact that there was not in the situation of the property any immediate necessity for having the deed. The fact that Cutler was authorized to effect a sale of the property after the sheriff's sale of 1864, is quite as consistent with the desire to realize out of the property the means to discharge the mortgage indebtedness, as with the idea of a trust for the complainant.

Whatever view may be entertained with regard to the purchases of the personal property and of the equity of redemption in the lands, in 1862 and 1863, the overwhelming weight of the evidence is in favor of the allegation of Hill that the purchase of 1864 was for the benefit of George Walker, under an expectation that from a future disposition of the property the claims of the mortgagees would be satisfied, without any trust over for the use of the complainant.

In this view of the testimony in relation to the sale of 1864, the complainant has no right to relief as to the farm which was conveyed to McAlpine. But if a different view of the evidence had been entertained, McAlpine would be entitled to the protection of a court of equity. The contract to purchase from Hill was signed on the 21st of August, 1866. The complainant was at once made acquainted with the proposed sale. The deed was executed and delivered on the 15th of September, 1866, when the residue of the consideration money was paid. On the 30th of August, 1866, a *lis pendens* was filed in the clerk's office of the county of Morris by the complainant. No bill of complaint had been filed; and, as a statutory notice, the filing of *lis pendens* was a nullity. *Nix. Dig.* 112, § 57. But the defendants had such information of the existence of that paper as to make inquiry a duty. On the same day of the filing of the *lis pendens*, the solicitor of the executors of Hill wrote to the chancery office, making

inquiry whether any bill had been filed. On the 1st of September, 1866, a reply in the negative was received, and the sale was proceeded with. The filing of the *lis pendens*, without any bill having been previously filed, was, in itself, a fraud, and when the parties interested in the proposed sale had sought the sources of information to which that notice legally led, and found that it was a sham, it ceased to have any effect as constructive notice, and they were entitled to conclude the sale without further search for information. On the 21st of March, 1867, the complainant procured from George Walker a release of all claims and demands, which included the balance due him upon the decree in the Atwater case. On the 2d of April, 1867, the notice of *lis pendens* was struck from the records of the Court of Common Pleas of the county of Morris, by the consent of the then solicitor of the complainant. The bill in this case was not filed until November, 1867. In the meantime, McAlpine was in possession, and had expended from $6000 to $8000 in repairs upon the premises. The release of March 21st, 1867, the complainant in his bill relies on, as an extinguishment of his indebtedness to George Walker, under the Atwater decree. It is a serious question whether the acceptance of that release was not a ratification of the sale to McAlpine. But aside from that, the circumstances which transpired before this bill was filed, and the delay in commencing this suit, were such as to make it inequitable to deprive McAlpine of the fruits of his purchase, and would extinguish whatever equity the complainant might otherwise have had to have the lands restored to him.

With respect to the purchase of the personal property in 1862, and of the equity of redemption in the several lots in 1862 and the spring of 1863, Hill makes no claim that they were purchased by him for the benefit of George Walker. All the personal property sold was purchased in the name of Hill, except some few articles, amounting to $123. The gross amount of the sale was $3089.72; in which was included the proceeds of the sale of the library and library

furniture. The complainant testifies that the library and library furniture were worth $8000, and the other personal property an additional $8000. The equity of redemption in the farm, and in four outlying lots, containing about thirty-two acres, was purchased by Hill. For the former he paid the sum of $20, for the latter $34. The encumbrances by mortgages on these lands was $28,500, exclusive of Cutler's mortgage. The condition of the stock is graphically described by Mr. Cutler, in his letter to Hill of March 24th, 1862. He says: "The property was worth last fall, at least $2500, but sold to-day it would not bring $1000. Some of the horses when down are so poor that they cannot rise without assistance." The sale was in 1862, when market values were much depressed. Sheriff Demott testifies that the sale of the personal property was a fair sale; that he knew of no step taken by any one to prevent the property bringing its full value, and that the articles sold as well as articles ordinarily do at sheriff sales. The Chancellor was of the opinion that there was no unusual sacrifice of the complainant's property at any of these sales; and I see no reason to dissent from his conclusions. The time for the sale was selected by the complainant, and there is no proof of the use of any fraudulent or oppressive means by Hill to obtain the complainant's property at a sacrifice.

But if we accept the complainant's version of the transactions between him and Hill in relation to these sales, he is not entitled to relief. On his own showing, the arrangement was prompted by a desire to place his property beyond the reach of other creditors, which was consummated by the sales which ostensibly put the title in Hill.

The allegation in the bill that his motive in having the property purchased in and held by Hill, was to prevent its being sacrificed by a forced sale, under disadvantageous circumstances, and to enable him, by a subsequent judicious disposition of it, to realize its fair value, in order to apply the proceeds in payment of his debts to effect his emancipation from debt, will not avail the complainant. The policy

of the statute concerning fraudulent conveyances, will not permit a debtor, secretly, to become in effect the trustee of his property for the benefit of his creditors, retaining within his own control the option whether, and when, it shall be applied in payment of their demands. It is not essential, in order to bring a case within the operation of the statute, that there should be actual fraud in the sense of an intention, ultimately, to cheat the creditors of a defendent in execution out of their claims. Any device by means of a conveyance of a debtor's property, whether made directly by the debtor himself, or by the intervention of a sheriff's sale, which places it beyond the reach of creditors, upon a trust in favor of the debtor, with the intention to hinder or delay creditors, is in violation of the statute, and illegal. *Owen* v. *Arvis,* 2 *Dutcher* 23; *Servis* v. *Nelson,* 1 *McCarter* 94; *National Bank of Metropolis* v. *Sprague,* 6 *C. E. Green* 530.

There may be instances in which an agreement between a defendant in execution and a third party for purchasing in the property of the former, at a judicial sale, upon a trust for his benefit, may be sustained. But where there are other creditors, who are not parties to such an arrangement, and the combination is secret, and the motive which prompted it is the present disposition of the debtor's property to avoid its subjection to execution and sale, at the instance of such other creditors, in payment of their demands, whenever they see fit; and the sale is effected at the instance of the debtor, and his property by such means is purchased in at inadequate prices; the transaction is one which cannot receive the approbation of the court, without sanctioning practices, the tendency of which will inevitably be to encourage frauds upon creditors. A trust founded upon an agreement contrary to the policy of the statute of frauds, will not be enforced. *Servis* v. *Nelson,* 1 *McCarter* 94, and cases cited in *Marlatt* v. *Warwick,* 4 *C. E. Green* 439.

Where the proof is full to the point of a precedent contract to purchase in property for the benefit of the defendant in execution, and under such a contract his property has

been obtained at the sale by the sheriff at inadequate prices, the court will, nevertheless, refuse to enforce the specific performance of the contract for redemption, if the transaction is of such a character as to affect injuriously the rights of creditors. *Merritt* v. *Brown*, 6 *C. E. Green* 401.

The sale of the personal property was effected by virtue of executions on the two judgments of Hill, and a judgment in favor of one Thompson. The Thompson judgment was for the sum of $10,756. The sales of the equity of redemption in the lands were made under the same executions, together with executions upon six other judgments which appeared on the records as amounting to about $3000. The Thompson judgment had been previously paid; and the complainant testifies that, in 1861, of the nine judgments on which these sales were made, none of them, except Hill's two judgments, and two judgments in favor of Bowen and Leddy, which amounted together to about $1200, had any legal life. He further testifies that his embarrassments arose from the debts of others, for whom he was surety; that he himself forced the sale of 1862, and that his object was to place his property in safe hands, that he might enter the service of his country without incurring the risk of his property being sacrificed by any thing that might occur during his absence. Mr. Cutler also testifies that it became necessary to have the title of the personal property out of the complainant, because of subsequent judgments.

After the disposition of the whole of the complainant's property was effected, Cutler, in 1867 or 1868, purchased the judgments of Bowen and Leddy for twenty-five or thirty cents on a dollar.

It is impossible to conceal the real nature and purpose of this transaction. The Chancellor, in his opinion, declares it to be a clear case of fraud upon creditors, and his conclusion is fully justified by the evidence which the complainant himself has furnished. Upon such a case the complainant can have no relief.

A further point was made by the complainant's counsel; that there had not been a legal delivery of the deed to Hill under the sheriff's sale of 1864, and that, consequently, his legal title had failed.

The proof is, that the deed was executed and acknowledged by Sheriff Demott, in his county, on the 19th of September, 1864, and was left with his successor, Sheriff Fairchild, with directions to deliver it on the receipt of the purchase money. It remained in Fairchild's possession until the fall of 1866, when, by arrangement with the solicitor of Hill, he took it to New York city and there delivered it to Van Buren, the attorney in fact of Hill.

The effect of this mode of delivering the deed is not within the issue made in this cause, but, nevertheless, the question has been considered by this court as a practical question of great moment. If the delivery of a deed in pursuance of a judicial sale, cannot be made in another state, the same reasons which make such delivery null, will equally invalidate the act if done in another county within the state.

In *Dean* v. *Thatcher*, 3 *Vroom* 470, this court held that the giving to the sheriff by the defendant in execution, in another county, a list of his property to be levied on, was a sufficient levy; the property being at the time within the county of which the officer was sheriff, although the sheriff never took the property into possession, or saw it.

After a sale by a sheriff in compliance with the law is made, it is his duty to make the necessary conveyance to vest the title accordingly. The performance of this duty is not an official act of such a nature that, if done without the county, it is void. The delivery of the deed in pursuance of the sale, is a mere ministerial act, which may be done anywhere, as may suit the convenience of the parties.

The decree of the Chancellor is affirmed, with costs.

                                        The whole court concurred.